In re Dwayne BODRICK, Kimberly Bodrick, Debtor(s).

DeWayne M. Jennings, Plaintiff(s)

v.

Dwayne A. Bodrick, Defendant(s).

Bankruptcy No. 11–50090.
Adversary No. 11–2162.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Signed April 18, 2014.

Joy Lenore Marshall, Columbus, OH, for Plaintiff.

Joseph M. Romano, The O'Brien Law Firm, Westlake, OH, for Defendant.

### MEMORANDUM OPINION DISMISSING COMPLAINT

BETH A. BUCHANAN, Bankruptcy Judge.

This matter is before this Court on plaintiff DeWayne M. Jennings' ("*Jennings*") *Third Amended Complaint for Exception to Discharge of Dwayne A. Bodrick Under 11 U.S.C. § 523* [Docket Number 56] (the "*Complaint*"), defendant Dwayne A. Bodrick's (the "*Debtor*") *Answer* [Docket Number 75] and the parties' trial briefs [Docket Numbers 90, 95]. On May 20, 2013, this adversary proceeding was reassigned to this Court by the Hon-

orable C. Kathryn Preston of the United States Bankruptcy Court for the Southern District of Ohio, Eastern Division [Docket Number 69]. A trial was held on December 11 and 12, 2013.

## I. *Jurisdiction*

At issue before this Court is the nondischargeability of a debt under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6).[1] Also before this Court is a request for costs and attorney's fees under 11 U.S.C. § 523(d). This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## II. *Findings Of Fact*

At the outset, this Court notes that the circumstances surrounding this case made it rather difficult to ferret out the actual events that resulted in the present controversy. The relevant facts in this case occurred roughly fourteen years ago, and the story involves one, if not several, Nigerian investment fraud schemes. Neither Jennings' nor the Debtor's version of the facts rang true, however, overall this Court found Jennings to be more credible than the Debtor. In addition, the litigation strategies employed throughout this case and continuing through the trial—including late disclosure of last minute witnesses,[2] springing new legal theories at the time of trial and the peculiar use of previously undisclosed evidence for impeachment purposes—further muddied the waters. Notwithstanding, on the record presented, this Court distills the material facts to be as follows.

No testimony was offered as to the specific age or educational background of either Jennings or the Debtor, however, the testimony suggested that the Debtor is older than Jennings. The Debtor and Jennings grew up in the same neighborhood in Youngstown, Ohio. Many years later, they ran into each other at a grocery store in Columbus, Ohio and exchanged pleasantries and business cards. Jennings testified that the Debtor held himself out to be a "financial planner" who could offer "investment opportunities" to Jennings. The Debtor testified that at that time he worked in "financial services," specifically that he was licensed to sell accident, life, and health insurance, and that he was "working with a Mr. Pressley."[3] The Debtor testified he was also a licensed mortgage broker. Jennings testified that the Debtor told him he was very successful at what he did—at some point offering a picture of his home as evidence of his success—and that he had his own business called National Liberty Corporation. After several telephone conversations and a meeting at an Applebee's for lunch, Jennings decided to make an investment described to him by the Debtor as having a

---

1. Unless otherwise indicated, the terms "Bankruptcy Code," "Section" and "§ " refer to Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

2. At the trial, this Court granted the Debtor's *Motion in Limine to Exclude the Testimony of Certain Undisclosed Witnesses in Violation of Fed. Civ. R. 26(e)* [Docket Number 96].

3. It is not entirely clear to this Court who Charles Pressley is. The Debtor testified that

Mr. Pressley was a business associate of his with whom the Debtor invested money. In his testimony, Jennings questioned the existence of Mr. Pressley, alleging that Mr. Pressley is an alias of the Debtor created to perpetuate this fraud. John Spencer, another alleged investor, testified that at some point he met a man who was introduced to him by the Debtor as being Mr. Pressley, but questioned whether or not the man he met was, in fact, Mr. Pressley.

"higher interest rate" and a "guaranteed return."

Discussed repeatedly at the trial was a March 23, 2001 fax from a Patrick C. Nduka at Union Bank in Nigeria to Jennings [Plaintiff's Exhibit 9, Debtor's Exhibit H] (the "*$9M Nduka Fax*"). The $9M Nduka Fax bears the header of "Union Bank (Nig.) PLC." along with a logo showing a horse standing on its rear legs. Because it is not possible to paraphrase its contents, the body of the $9M Nduka Fax reads—verbatim—as follows:

Attn: Mr. Dwayne Jennings
8922 LupineDr.
Reynoldsburg, Ohio 43068
Sir,
Please find the enclose letter regarding your assistance with the estate of Mr. Pressley. The total amount of the estate as at December 31st is US $24,613,-000.00.

I have spoken to Mr. Bodrick and informed him that Union Bank along with the Federal Inland Revenue has and will receive over US $368,000.00 to pay legal, administrative and Tax expenses for this transfer with only US $28,500.00 to effect transfer of US $9,000,000.00 to Bank One NA 100 E. Broad Street Columbus, Ohio, 43271.

On February 21st 2001 our Telex Department through foreign operations has sent a release order to our correspondent Bank National Westminster Bank Plc. 6 International Trade and Banking Service overseas Branch Operations King Cross House 200 Pentvill Road London England, Phone # 011-44-207-726-1000.

For your assitance this document will act as an official letter of guarantee to pay you the sum of US $42,750.00 on or before April 15th 2001. Mr Bodrick has assigned power of Attorney of the US

$9,000,000.00 to ensure all investors will be paid through Bank One NA.

This letter stands as a Promissory Note to you, and if you have any question or concern, please call my office. I will be more than glad to talk with you. Again, thank you for your assistance and I look forward to meeting you soon.
Sincerely Yours,
[Signature]
Patrick C. Nduka (Mr.)
Ag. Chief Accountant
Union Bank Nig. Plc.

Jennings testified that the $9M Nduka Fax was given to him by the Debtor. The Debtor denied giving it to Jennings, alleging instead that Jennings acquired it directly from Mr. Pressley. On this particular point, this Court finds Jennings' testimony to be more credible, especially because the $9M Nduka Fax makes an express reference to the Debtor. Regardless of how Jennings came to acquire the $9M Nduka Fax, Jennings had it before he made his investment.

On March 30, 2001, Jennings and the Debtor went to a Bank One Corporation branch office where Jennings transferred $26,000 from his account to an account at "HSBC–Hong Kong Shanghai Bank Corp." in Taiwan [Plaintiff's Exhibit 11] (the "*$26,000 Wire*"). The $26,000 Wire is evidenced by a Bank One Corporation wire transfer outgoing request (the "*Wire Request*"). The Wire Request shows the beneficiary of the $26,000 Wire to be "Chen Hsaing Ohg." Jennings testified that the Debtor gave the specific wire instructions to the banker assisting them. The Debtor denied giving the wire instructions to Jennings, instead testifying that Jennings obtained the wire instructions directly from Mr. Pressley and that he accompanied Jennings to the bank only to offer moral support. On this particular point, this Court finds Jennings's testimo-

ny to be more credible, especially in view of Jennings' apparent lack of knowledge of wire transfers in general. Regardless, who supplied the wire instructions to the banker is not determinative in this Court's decision.

Also while at the bank, Jennings provided the Debtor an "Official Check" in the amount of $2,500 payable to National Liberty Corp. [Plaintiff's Exhibit 10] (the "*$2,500 Check*").Jennings testified that this was the Debtor's fee for the investment. The Debtor testified that this money was to cover additional wire costs and that the Debtor forwarded this money to Mr. Pressley. The Debtor further testified that Jennings wanted to give him cash and that the Debtor didn't want that responsibility and so he agreed—as a one-time exception—to take a check payable to his company that he would then forward to Mr. Pressley. On this point, this Court finds the Debtor's testimony to be completely implausible. Regardless of the reason behind the $2,500 Check or into whose pocket it eventually went, this Court notes that the sum of the $2,500 Check and the $26,000 Wire is $28,500, the amount of Jennings' investment referenced in the $9M Nduka Fax.

Jennings testified that he believed that this investment was to "raise money to pay taxes to release funds from an account." He further testified that he thought it involved an "irrevocable trust." He testified that he believed he would be receiving part of the $9 million referenced in the $9M Nduka Fax. Jennings was unable to describe any independent research he did prior to the investment,[4] other than describing his questions directed to the Debtor.

The investment return date of April 15, 2001 as stated in the $9M Nduka Fax

came and went without any money materializing from Union Bank in Nigeria, or from any other source. Both Jennings and the Debtor testified that Jennings constantly asked the Debtor for "updates" and "documentation"—anything to show "where did the money go?"

In response to Jennings' requests, the Debtor admitted supplying to Jennings a copy of a letter to the Debtor from Ezeh Ugochukwu at Union Bank Nigeria Plc which reads in its entirety—verbatim—as follows [Plaintiff's Exhibit 4, Debtor's Exhibit B] (the "*$16.3M Ugochukwu Letter*"):

From: Ezeh Ugochukwu
Chief Accountant
Union Bank Nigeria Plc
Lagos Nigeria
7th July, 2000

Attn: Mr Bodrick Dwayne,

How are you today? Following our telephone conversation yesterday, I am writing you this letter in other to let you know the balance in the account of the deceased Late Dr Thomas Walter as at the 30th of June, 2000.

The amount currently in the account is at the tune of US $16,339,421.91, including interest due as at 30th June, 2000. Remember, our interest-rate on such domiciliary account with Union Bank is 17%.

The original cpoy of the bank statement to the account which is due for despatch to respective customers is yet to be signed. That I would come along with, come ending of this month when I will be visiting the united states with my wife.

Thanking you for your kind co-operation.

---

**4.** Jennings testified that he began to investigate via the internet after becoming suspicious about the investment, but this apparently occurred *subsequent* to the $26,000 Wire.

Regards,
[Signature]
Ezeh Ugochukwu
Chief Accountant
Union Bank Nigeria Plc
Lagos Nigeria

Jennings described the $16.3M Ugochukwu Letter as an "example" of the Debtor's "guarantee" to him. The Debtor testified that Dr. Walter was a business partner of Mr. Pressley. Both Jennings and the Debtor acknowledged that this $16.3 million "deal" was different than the $9 million "deal."

Also, the Debtor admitted sending an email dated December 12, 2001 [Plaintiff's Exhibit 12] to Jennings, the body of which reads in its entirety—verbatim—as follows:

To: DeWayne Jennings:

Re: Funds

As discussed with you on 12/07/01 funds are currently with Union Bank Plc. until all requirements have been made regarding Marginal Fluctuation Rate to the Board of Inland Revenue. No monies will be paid to investors until this requirement has been made. Of the $123,000.000 due to the Federal Inland Revenue $83,700.00 has been paid since 11/20/01. With the remaining $39,300 that has to be raised, $25,900.00 has been committed to be sent leaving $13,400 remaining. Please refer to deed of agreement between Federal High Court and Union Bank Plc regarding international banking policy.

Also, the Debtor admitted sending a fax dated January 29, 2002 [Plaintiff's Exhibit 13] (the "*January 29, 2002 Fax*") to Jennings which reads in its entirety—verbatim—as follows:

January 29, 2002

To: DeWayne Jennings

From: Dwayne Bodrick

A summary of our morning discussion regarding Union Bank, I will contact John Uche acting attorney to the estate of Charles Pressley in reference to Union Banks transfer of funds to Global Securities U.K. and forwarding the remainder balance of $8300.00 to complete full Marginal Fluctuation Rate and transfer into Bank One. Will call Thursday 1/31/02 with time of phone conference.

Sincerely,

Dwayne Bodrick

Jennings contends that he received four other documents from the Debtor in response to his various requests for information. First, a fax dated August 29, 2000 from J. Omoruyi at Union Bank in Nigeria to the Debtor (the "*$16.3M Omoruyi Fax*"). The $16.3M Omoruyi Fax is very similar in appearance to $9M Nduka Fax. It bears the same header of "Union Bank (Nig.) PLC" along with the same logo showing a horse standing on its rear legs. The body of the $16.3M Omoruyi Fax reads in its entirety—verbatim—as follows:

Attn: Mr Bodrick Dwayne,

Sir,

Following my telephone conversation with you today, and in order to guarantee you of the readiness of the Bank in transferring your money to Bank One in the U.S., I hereby send you this letter as a guarantee that once we acknowledge that payment of US $9,000.00 (Nine Thousand United States Dollars) from you, we are bound by law in the act authorising us as a bank to effect your payment immediately.

The above money is the cost of transfer of US $16.3 Million as the transfer charged is statutory in any banking system.

Yours Sincerely,
[Signature]
Mr. J. Omoruyi
Ag. Chief Accountant
for: Union Bank PLC
Lagos Nigeria

Second, the first page of a multiple page document, which appears to have been previously copied or faxed, titled "Federal Government of Nigeria Payment Voucher" [Plaintiff's Exhibit 1, Debtor's Exhibit A] (the "*$26.6M Pipeline Payment Voucher*"). The document is not completely legible, nor is it apparent how this document supports the underlying investment that Jennings believed he was investing in. It has an invoice date of December 7, 1992 and a reference to a "contract" for the "design and construction of oil pipeline installation of [illegible] axle 110 BPSD computer, turbines, and instrumentation control test at Warri Refinery" at a rate of US $26,600,000.00. The document appears to be a screen shot or printout from the following website: http://www. superhighway.is/iis/doc14.html, with an indicated printing date of 11/16/00.

Third, the second page of a multiple page document with a header of "CHI PROPERTIES CONSULTANCY LTD" [Plaintiff's Exhibit 2] (the "*Chi Properties Sub–Lease*").It starts with the verbiage "4. Sub–Lease" and at the bottom identifies "Mr T Walters" as a sub-lessor. It is dated "30th/9/95." It does not identify the sub-lessee or the property being sub-leased.

Fourth, the first page of a multiple page document, which appears to have been previously copied or faxed, titled "Approval notice" from the "FUND RE-LEASE/BUDGET OFFICE, Office of the Presidency, Central Bank of Nigeria, Tinu-

bu Square, Lagos, Foreign Exchange Release Order Approval Notice" [Plaintiff's Exhibit 3] (the "*$31.6M Pipeline Approval Notice*"). The document is not completely legible; however, a reference to a "construction/computerization of pipeline" and a reference to "THIRTY–ONE MILLION SIX HUNDRED THOUSAND U.S. DOLLAR" are barely readable. It has a date of June 17, 1996 and bears several seals and stamps one of which says "Classified Document." The document also appears to be a screen shot from a website similar to the one referenced above: http://www. superhighway.is.iis/approval_notice.html, with an indicated printing date of 11/16/00.

The Debtor denied providing these four documents to Jennings, testifying that, like the wire instructions, Jennings must have received these documents directly from Mr. Pressley. Regardless, who supplied these additional documents to the Debtor is not determinative in this Court's decision.

Several months later, with the Debtor still attempting to "raise the money to pay the taxes," Jennings asserts that he invested an additional $10,000, also by wire transfer. However, Jennings was unable to provide any proof beyond his testimony of this additional investment.

At some point, although it is not entirely clear to this Court exactly when, Jennings, along with other investors, became suspicious and went to the legal authorities. Sometime in 2003, the Debtor admits to receiving a cease and desist order (the "*2003 Cease and Desist Order*")to stop whatever involvement he had with Mr. Pressley and Jennings and other investors.[5] Both Jennings and the Debtor testified that there was no further commu-

---

5. The 2003 Cease and Desist Order was not introduced into evidence, nor does it appear

elsewhere in the record before this Court.

nication between them subsequent to the issuance of the 2003 Cease and Desist Order.

On November 8, 2004, the Debtor and his wife filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio, Case Number 04–67790 (the *"2004 Bankruptcy"*). The Debtor and his wife were issued a discharge in the 2004 Bankruptcy on March 1, 2005.

On March 17, 2009, Jennings filed a complaint against the Debtor in the United States District Court for the Southern District of Ohio, Case Number 09–CV–208 (the *"District Court Action"*). The complaint included one count under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), one count under Ohio Revised Code §§ 1701.01 to 1707.45, one count of fraud, and one count for breach of contract.

On April 5, 2010, the Debtor and his wife filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio, Case Number 10–53984 (the *"2010 Bankruptcy"*), effectively staying the District Court Action. On July 12, 2010, Jennings, acting *pro se,* filed an adversary proceeding against the Debtor, Adversary Number 10–2319, with counts under 11 U.S.C. §§ 523 and 727. The 2010 Bankruptcy was dismissed on October 12, 2010 and the District Court Action was subsequently reactivated. In light of the dismissal of the main case and the reinstatement of the District Court Action, the related adversary proceeding was also dismissed. A trial date of January 11, 2011 was set in the District Court Action. The Debtor and his wife filed the instant Chapter 13 petition on January 6, 2011 and this adversary proceeding was filed on April 11, 2011.

## III. *Discussion And Legal Conclusions*

### A. *Jennings Is Not An Unknown Creditor*

At the close of Jennings' case in chief, the Debtor made an oral motion to dismiss the complaint under Rule 50 of the Federal Rules of Civil Procedure (the *"Oral Motion"*) on the grounds that any debt owed to Jennings was discharged in the Debtor's 2004 Bankruptcy.[6] Citing *In re Eagle–Picher Indus., Inc.,* 278 B.R. 437 (Bankr.S.D.Ohio 2002), the Debtor argues that Jennings was an "unknown creditor" at the time of the 2004 Bankruptcy such that publication of the Debtor's bankruptcy filing in the Columbus, Ohio *Daily Reporter* was sufficient notice to discharge any claim that Jennings may have against the Debtor.

■ Procedurally, it is not appropriate to raise a new legal theory at the time of trial. *Cf. Salyers v. City of Portsmouth,* 534 Fed.Appx. 454, 461 (6th Cir.2013)("[A] party prejudices his opponent by missing the trial court's scheduled deadlines and waiting until after summary judgment motions are filed before introducing entirely new legal theories.")(citing *Priddy v. Edelman,* 883 F.2d 438, 446–47 (6th Cir.1989)). This Court's September 24, 2013 amended scheduling order required the Debtor to file a trial brief by November 25, 2013. At the very latest, this new legal argument should have been raised at that time. Regardless, the Oral Motion fails on the merits.

---

**6.** Because this was not a jury trial, this Court will treat the Oral Motion as one brought under Rule 52 of the Federal Rules of Civil Procedure, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.

■ The Debtor argues that Jennings' own testimony during the trial supports the Debtor's position that Jennings was an unknown creditor. Jennings in essence testified that he did not believe he had a claim against the Debtor until 2005 when he became aware of the fraud. Jennings testimony in this regard is not credible. Jennings clearly had doubts regarding the return of his investment well prior to 2005 based on his constant inquires to the Debtor regarding repayment of the investment.[7] Regardless, the question of whether a creditor is a "known" or "unknown" creditor does not turn on the *creditor's* knowledge of its claim but rather on the *debtor's* knowledge. "The United States Supreme Court has defined a 'known' creditor as one whose identity is either known or 'reasonably ascertainable *by the debtor.*'" *In re Eagle–Picher Indus., Inc.,* 278 B.R. at 453 (citing *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988)) (emphasis added).

■ Jennings, as well as the other "investors" that the Debtor sought out, were clearly known to the Debtor as was the nature of their potential claims against the Debtor. The Debtor knew before soliciting additional investors that the promised return on his own investment in this same or similar "deal" had not been fulfilled.[8] In fact, the Debtor testified that the failed return on his investment was a factor leading to the filing of the 2004 Bankruptcy. Yet, the Debtor continued to seek investors and, once obtained, supplied them with ongoing "updates" on the anticipated repayment of their investments. Moreover, the 2003 Cease and Desist Order issued against the Debtor restraining him from any further communication with Jennings (and others) should have been sufficient for the Debtor to "reasonably ascertain" that Jennings had a potential claim against him at the time of the 2004 Bankruptcy. As a creditor, then, with a "reasonably ascertainable" claim as of the filing date of the 2004 Bankruptcy, Jennings was a known creditor entitled to "actual written notice" of the Debtor's case. *Id.* (citing *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3d Cir.1995), *cert. denied,* 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996)). A review of the record in the 2004 Bankruptcy indicates that Jennings was not listed as a creditor in that case, nor did he receive "actual written notice" of the filing.

Accordingly, the Oral Motion is DENIED.

**B.** ***The Debt Is Not Excepted From Discharge Under 11 U.S.C. § 523(a)(2)(A)***

■ Under § 523(a)(2)(A), there is an exception to discharge of a debt "for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross reck-

---

**7.** It is more probable that Jennings' testimony regarding when he became aware of a claim against the Debtor is a hope to avoid a possible statute of limitations defense with regard to the District Court Action, which was not filed until 2009. *Cf.* Case Number 11–50090, John Spencer Proof of Claim Number 15, p. 7 Columbus Division of Police Preliminary Investigation Report ("Checks to suspect that were shown to reporting detective are from a period that is beyond statute of limitation. Victims believe that statute should not apply, since their attempt to recover money has been ongoing.").

**8.** *See infra* note 9.

lessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.1998). A false representation has been defined as "an expressed misrepresentation." *Wings & Rings, Inc. v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999)(citing *In re Lewis*, 164 B.R. 588, 591 (Bankr.N.D.Ohio 1994)). In contrast, false pretenses involve "an implied representation or conduct that is intended to create and foster a false impression." *Id.* Actual fraud is a broader concept that has been defined as "any deceit, artifice, trick or design involving a direct and active operation of mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating a cheat or deception." *Coughlin Chevrolet, Inc. v. Thompson (In re Thompson)*, 458 B.R. 409, 421 (Bankr.S.D.Ohio 2011)(internal quotation marks and citations omitted). The creditor bears the burden of proving

each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Whether characterized as a false representation, false pretenses, or actual fraud, this Court concludes that the Debtor intended to defraud Jennings.[9] The pivotal issue before this Court, however, is whether Jennings justifiably relied on the Debtor's false representation. Justifiable reliance "is a matter of the qualities and characteristics of the particular [creditor], and the circumstances of the particular case, rather than of the application of a community standard of conduct...." *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance means that a creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (citation omitted).

9. Supporting Jennings' contention that the Debtor was the "orchestrator" of Jennings' investment, as well as that of at least one other person, was the very credible testimony of Mr. Spencer. In August, 2000, Mr. Spencer invested $21,000 through Union Bank based upon the Debtor's representation that he knew of a "high yield" investment that would pay him back in "less time." Mr. Spencer testified that the Debtor gave him various documents from Nigeria to substantiate the investment; that the Debtor accompanied Mr. Spencer to Mr. Spencer's bank; that the Debtor provided wire instructions to affect a wire transfer to "Hong Shanghai Banking Corporation, Ltd." When Mr. Spencer's money was not returned, he asked the Debtor to write him checks to cover the investment. In September 2000, the Debtor gave Mr. Spencer two checks totaling $53,000. The checks were returned for insufficient funds. At the trial, the Debtor testified that there was never more than $10 in the account on which those two checks were drawn. Mr. Spencer

further testified that he and several others, including Jennings, got together and went to the Columbus police, the SEC and the FBI. It was then that they were told that this was part of an international crime scam involving an inheritance.

The Debtor's primary defense to Jennings' claim of fraud is that the he, too, invested $35,000 involving Union Bank in Nigeria—albeit years earlier in February 1996—and that he, too, never received any money from his investment. The Debtor had no documentary proof of his $35,000 investment nor any rational explanation why—five years later—he still believed that any investment involving Union Bank in Nigeria could possibly be a sound investment at all, much less a "guaranteed" investment with a good return.

Because this Court finds that Jennings has failed to prove justifiable reliance, *see infra*, it is not necessary for this Court to perform an extensive analysis of either Jennings' fraud claim or the Debtor's defense to the fraud claim.

By his own testimony, Jennings' investigation consisted of talking to the Debtor. Jennings admitted that he did not understand the Debtor's explanation of the investment. Rather, when asked at trial why he made this investment, Jennings testified he thought the Debtor was trustworthy, that he had known the Debtor's younger brother back in high school and that he thought the Debtor was successful. Jennings' failure to perform even a cursory examination or investigation of the investment and his blind reliance on his perceptions of the Debtor's character and wealth is not justifiable reliance under the facts of this case. *Field,* 516 U.S. at 71, 116 S.Ct. 437; *see also Krist v. Curtis (In re Curtis),* 345 B.R. 870, 875 (Bankr. N.D.Ill.2006) ("By failing to examine the investment at all, he assumed its risk.").

Importantly in this regard, this Court notes that Jennings' expected profit of $14,250—a 50% return on his initial investment of $28,500—in only 16 days computes to an annualized simple interest rate of return of 1140.625%.[10] This wildly improbable rate of return alone should have signaled to Jennings that this investment required additional due diligence and scrutiny. Such a high rate of return over a very short period of time was "a clear red flag that this was a high-risk speculative venture.... Promises that sound too good to be true usually turn out to be just that—too good to be true." *Johnson v. Curtis (In re Curtis),* 2006 Bankr.LEXIS 911, at *29, 2006 WL 1506209, at *9 (Bankr.C.D.Ill. May 24, 2006) (involving a 100% rate of return within 15 days of the investment) (citing *U.S. v. Frykholm,* 362 F.3d 413, (7th Cir.2004) (observing that a 100% rate of return within one month of

investment was "transparently too good to be true")).

Further, the documentation that Jennings allegedly relied on in making the investment is nothing short of nonsensical. Among those, the $9M Nduka Fax, which promised a distribution of $9 million to all investors, is the only document which Jennings was shown to have received prior to making his investment. As to the remainder of the documents discussed—the $16.3M Ugochukwu Letter, the $16.3M Omoruyi Fax, the $26.6M Pipeline Payment Voucher, the Chi Properties Sub-Lease and the $31.6M Pipeline Approval Notice—it is unclear to this Court when Jennings actually received them.[11] Regardless, the timing of Jennings' receipt of these documents does not aid his case. If Jennings did not receive these items until after his investment, then he could not have relied on them to make the investment, justifiably or not. If Jennings did, in fact, receive the documents prior to making his investment, they are simply further evidence that Jennings failed to use his senses whatsoever in making the investment. This Court notes the numerous logical and factual inconsistencies between the various documents. They refer to at least four different underlying investments (a sub-lease, an oil pipeline and two different inheritances) and no less than four different amounts of the total return of the underlying investment. Even under the assumption that Jennings did receive the documents prior to making his investment, this Court cannot fathom how anyone could have justifiably relied on these documents, read together, in making an investment such as the one involved in this case.

---

**10.** Calculated using the following formula: Future Value = Present Value (1 + (Rate of Return × (Number of Days/365))).

**11.** Neither party elicited clear testimony from Jennings on this timing issue.

Accordingly, this Court finds that Jennings has failed to prove justifiable reliance by a preponderance of the evidence and, therefore, this Court finds that the debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

### C. *The Debt Is Not Excepted From Discharge Under 11 U.S.C. § 523(a)(2)(B)*

■ Under § 523(a)(2)(B), there is an exception to discharge of a debt "for money ... to the extent obtained by ... use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's ... financial condition; (iii) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive...." 11 U.S.C. § 523(a)(2)(B). The creditor bears the burden of proving each of these elements by a preponderance of the evidence. *Grogan,* 498 U.S. at 291, 111 S.Ct. 654.

■ The phrase "respecting the debtor's ... financial condition" has been narrowly interpreted in this circuit to mean "statements that are made regarding a debtor's overall net worth, assets and liabilities." *Prim Capital Corp. v. May (In re May),* 2007 Bankr.LEXIS 2335, at *20, 2007 WL 2052185, at *7 (6th Cir. BAP July 19, 2007).[12] Assuming, *arguendo,* that either the $16.3M Omoruyi Fax, the $16.3M Ugochukwu Letter and/or the $9M Nduka Fax are materially false written statements respecting the Debtor's financial condition published by the Debtor with the intent to deceive Jennings, the pivotal issue before this Court is whether Jennings reasonably relied on the these written statements. Reasonable reliance is a higher standard than that of justifiable

reliance. *Oster v. Clarkston State Bank (In re Oster),* 474 Fed.Appx. 422, 425 (6th Cir.2012). The Sixth Circuit has identified five factors that may affect the reasonableness of a creditor's reliance:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* (*citing BancBoston Mortg. Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir.1992)).

■ While Jennings was obviously impressed by the Debtor, Jennings did not share a close personal relationship or even a friendship with the Debtor. Jennings had no previous business dealings with the Debtor. The documents upon which Jennings relied were nothing but red flags. Even a minimal amount of investigation by Jennings surely would have revealed some degree of inaccuracy of the Debtor's representations. In sum, no reasonable person would have relied on the Debtor's representations or the documentations provided to support them.

Accordingly, this Court finds that Jennings has failed to prove reasonable reliance by a preponderance of the evidence and, therefore, this Court finds that the

---

**12.** In contrast, a broad interpretation includes any communication that has a bearing on the debtor's financial position. *In re May,*

2007 Bankr.LEXIS 2335, at *16, 2007 WL 2052185, at *6.

debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

### D. The Debt Is Not Excepted From Discharge Under 11 U.S.C. § 523(a)(4)

Under § 523(a)(4), there is an exception to discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[13] To except a debt from discharge under § 523(a)(4), a creditor must show: "(1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) a resulting loss." *Patel v. Shamrock Floorcovering Servs. (In re Patel)*, 565 F.3d 963, 968 (6th Cir.2009)(citing *Bd. of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir.2007)). The creditor bears the burden of proving these elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 291, 111 S.Ct. 654.

The Sixth Circuit has adopted a narrow interpretation of a fiduciary in the context of § 523(a)(4). *In re Patel*, 565 F.3d at 968. "[S]ection 523(a)(4) covers only 'express' or 'technical trusts' and not trusts arising out of the very act of wrongdoing.... '[C]onstructive trusts,' which arise *ex maleficio* (at the time the wrong is done), do not satisfy the 'fiduciary capacity' requirement because the debtor was not a trustee before the wrong." *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (internal quotation marks omitted)). Proving an express trust relationship requires the creditor to show: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Id.* (citing *Commonwealth Land Title Co. v.*

*Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir.2005)); *see also Ulmer v. Fulton*, 129 Ohio St. 323, 195 N.E. 557, 564 (1935). A technical trust is a type of trust arising out of a specific statute or common law. *Ronk v. Maresh (In re Maresh)*, 277 B.R. 339, 348 (Bankr.N.D.Ohio 2001).

While Jennings may have approached the Debtor because he believed him to be trustworthy and successful, Jennings has failed to allege, much less prove, the existence of an express or technical trust. Jennings' sole argument as relates to the existence of a fiduciary relationship is that the Debtor held himself out to be a financial advisor/planner. In this regard, Jennings testified that he thought the Debtor was "a" financial planner; however, he also testified that he did not think the Debtor was "his" financial planner. Accordingly, Jennings' own testimony contradicts a finding of a fiduciary relationship because Jennings himself did not believe such a relationship existed.

Accordingly, this Court finds that Jennings has failed to satisfy his burden of proof by a preponderance of the evidence and, therefore, that the debt is not excepted from discharge under 11 U.S.C. § 523(a)(4).

### E. Jennings Has Failed To State A Claim Under 11 U.S.C. § 523(a)(6)

Under § 523(a)(6), there is an exception to discharge of a debt "for willful and malicious injury ..." 11 U.S.C. § 523(a)(6). The "superdischarge" in a Chapter 13 case, however, allows a debtor to discharge debts that may have been nondischargeable under § 523(a)(6) in a

---

**13.** While the Complaint includes references to embezzlement and larceny, Jennings did not pursue these claims at trial nor were these claims addressed in Jennings' trial brief. Accordingly, this Court finds that Jennings has abandoned any claims under 11 U.S.C. § 523(a)(4) relating to embezzlement or larceny. *Cf. United Bhd. of Carpenters and Joiners of America, Dresden Local No. 267 v. United Bhd. of Carpenters and Joiners of America, South Central Ohio District Council*, 992 F.2d 1418, 1424 n. 1 (6th Cir.1993).

Chapter 7 case if a debtor completes all payments required by the debtor's plan and receives a discharge pursuant to § 1328(a). *See* 11 U.S.C. § 1328(a)(2), *But see* 11 U.S.C. § 1328(a)(4) (debts pertaining to willful or malicious by a debtor that caused personal injury to or death of an individual are excepted from discharge); [14] 11 U.S.C. § 1328(c) (debts of the kind specified in § 523(a) are excepted from discharge if a debtor receives a "hardship discharge" pursuant to § 1328(b)). Therefore, if the Debtor completes all payments required by his Chapter 13 plan and receives a discharge pursuant to § 1328(a), any debt owed to Jennings arising from a willful and malicious injury to property of Jennings would be discharged.

Accordingly, this Court finds that Jennings has failed to state a claim under 11 U.S.C. § 523(a)(6). *See EZ Loans of Shawnee, Inc. v. Hodges (In re Hodges)*, 407 B.R. 415, 418–19 (Bankr.D.Kan.2009) ("Section 523(a)(6) is not incorporated into § 1328(a)(2); thus, [a creditor] fails to state a claim for relief by citing § 523(a)(6)."); *see also Direct Capital Group, LLC v. Hadley (In re Hadley)*, 2011 Bankr.LEXIS 3193, at *33–42, 2011 WL 3664609, at *16–17 (Bankr.E.D.Va. Aug. 19, 2011) (dismissing § 523(a)(6) claim without prejudice as not ripe for determination).

**F.  *An Award Of Attorney Fees Under 11 U.S.C. § 523(d) Is Not Warranted***

■ The Debtor seeks reimbursement of his costs and reasonable attorney's fees spent defending against Jennings' §§ 523(a)(2)(A) and (a)(2)(B) causes of actions pursuant to § 523(d) on the basis

that Jennings' was not substantially justified in pursuing these claims against the Debtor. Pursuant to § 523(d):

> If a creditor requests the determination of dischargeability of a consumer debt under § 523(a)(2), and such debt is discharged, the court shall grant judgment in favor of the debtor for costs of, and a reasonable attorney's fee for, the proceeding if the court finds that position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

■ Despite the fact that Jennings has not prevailed under either his § 523(a)(2)(A) claim or his § 523(a)(2)(B) claim, an award of costs and attorney's fees is not warranted in this case because the debt at issue is not a consumer debt.[15] A "consumer debt" is defined as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Throughout the trial, Jennings repeatedly referred to the transaction at issue as a "guaranteed investment." Investments are, as a basic premise, made with the end goal of achieving a return, or profit, on an initial investment. Although Jennings testified that the purpose of the investment was to eventually fund his daughter's education, his actions were clearly motivated by profit. A transaction is not a consumer debt when it is incurred with a profit motive. *Citizens National Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir.1990). As

---

**14.** *See Waag v. Permann (In re Waag)*, 418 B.R. 373 (9th Cir. BAP 2009)(discussing differences between § 523(a)(6) and § 1328(a)(4)).

**15.** Because this Court finds that the alleged debt at issue is not a "consumer debt" this Court need not address whether Jennings' actions were substantially justified or whether special circumstances exist that would make the award of costs and attorney's fees unjust.

860

such, this Court finds that this investment was not a consumer debt.

■ Furthermore, § 523(d) was enacted "to prevent the abusive practices of consumer finance companies, who often filed bad faith dischargeability actions" with the hope that the debtor will just settle the claim rather than bear the expense of defending the case. *Swartz v. Strausbaugh (In re Strausbaugh)*, 376 B.R. 631, 637 (Bankr.S.D.Ohio 2007) (citation omitted). Jennings is not a consumer finance company against whose bad practices § 523(d) was enacted to prevent, nor has the Debtor alleged the presence here of the type of creditor misconduct envisioned in the enactment of § 523(d).

Accordingly, this Court finds that an award of costs and attorney's fees under 11 U.S.C. § 523(d) is not warranted.

## IV. *Conclusion*

For the reasons stated above, this Court hereby finds in favor of the Debtor. The debt that is the subject of this adversary proceeding is dischargeable and the Complaint is hereby DISMISSED.

**IT IS SO ORDERED.**