NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0331n.06

No. 11-1388

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Mar 26, 2012*

LEONARD GREEN, Clerk

In re: CLAUDE OSTER )
)
    *Debtor.* )
)
----------------------------- )    ON APPEAL FROM THE
)    UNITED STATES DISTRICT
CLAUDE OSTER, )    COURT FOR THE EASTERN
)    DISTRICT OF MICHIGAN
    *Defendant-Appellant,* )
)        O P I N I O N
v. )
)
CLARKSTON STATE BANK,

    *Plaintiff-Appellee.*

BEFORE:    GUY, COLE, and ROGERS, Circuit Judges.

    COLE, Circuit Judge.  While seeking to obtain personal and business loans, Claude Oster provided false statements concerning his financial position and signed documents containing deceptive information.  When he sought bankruptcy protection, Clarkston State Bank, the lender, asked the bankruptcy court to declare the debt arising from the loans nondischargeable under 11 U.S.C. § 523(a)(2)(B), which excepts from discharge those debts obtained through the use of false statements.  The bankruptcy court determined that Oster's debts met the statutory requirements for nondischargeability, which the district court affirmed.  We AFFIRM.

## I. BACKGROUND

Between 2004 and 2005, Claude Oster sought a total of $1,350,000 in personal and business loans from Clarkston State Bank ("Clarkston"). To help procure these loans, Oster's personal accountant Howard Small prepared a series of financial statements. The first balance sheet, prepared in January 2005, showed marketable securities worth $8,255,000, owned by "Dr. and Mrs. Claude Oster." Three other statements were prepared over the next two years, showing similar numbers, though these subsequent statements all contained a footnote stating that the marketable securities were "jointly owned." The personal loan was renewed three times, eventually maturing in September 2007, while the business loan was set to mature in December 2008.

To obtain these loans, Oster signed several business loan agreements. These agreements contained language such as "Working Capital Requirements. Maintain Working Capital according to the following: Marketable security balance to be maintained at 4,000,000.00 to be tested quarterly" and "Tangible Net Worth Requirements. Maintain a minimum Tangible Net Worth of not less than $4,000.000.00." Oster signed these loan agreements, including signing one directly adjacent to the $4,000,000 figure. A series of computer printouts that displayed Merrill Lynch account balances was provided to Clarkston. The printouts used a shorthand name for the accounts, including "Terry-Fayez," and "Terry-Marsico." Terry is the first name of Oster's wife.

When he signed the loan agreements and submitted the financial statements, Oster did not, in fact, own any interest in the marketable securities. Oster testified that in or around 1994, he transferred ownership of the marketable securities to his wife after she expressed concern that Oster was an "impetuous health care entrepreneur" who may put their funds in jeopardy. At the time the

financial statements were provided to Clarkston, only Terry Oster, who was not a guarantor on any of the loans, had an interest in the listed marketable securities.

Clarkston demanded payment on the loans and received a judgment of $1,390,329 in Oakland County (Michigan) Circuit Court on September 24, 2008. Less than three weeks later, Oster sought relief under Chapter 7 of the Bankruptcy Code. Clarkston filed an adversary proceeding in Oster's bankruptcy case, contending that its claim should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) & (B). The bankruptcy court found in Oster's favor on the § 523(a)(2)(A) claim, but in Clarkston's favor on the § 523(a)(2)(B) claim. Oster appealed the decision of the bankruptcy court to the district court, which affirmed the bankruptcy court's judgment. This appeal followed.

## II. ANALYSIS

We review a bankruptcy court's factual findings for clear error, and its legal conclusions de novo. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1447 (6th Cir. 1994). We extend this deference only to the original bankruptcy court findings, and not to those included in the decision rendered by the district court, since we are "in as good a position to review the bankruptcy court's decision as is the district court." *Id.* (internal quotation marks and citation omitted).

*A. Oster's § 523(a)(2)(B) Claim*

The principal purpose of the Bankruptcy Code is to afford a "fresh start" to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)(internal quotation marks omitted). The discharge of prepetition debts provided under § 727(b) and the discharge injunction of § 524(a) effectuate the debtor's fresh start. *See Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992)

("The protection afforded by the discharge injunction...furthers one of the primary purposes of the Bankruptcy Code–that the debtor have the opportunity to make a financial fresh start." (internal quotation marks omitted)). Some debts, however, are "nondischargeable," such that the debtor's liability continues even after emerging from bankruptcy protection. Section 523 of the Bankruptcy Code specifies these exceptions, which include, among others, debt obtained through fraud. Section 523(a)(2)(B) addresses debt obtained by certain false statements in writing.

For a debt to be nondischargeable under § 523(a)(2)(B), four conditions must be met: the debtor must have sought "money, property, services, or an extension, renewal, or refinancing of credit" by use of a writing (1) "that is materially false;"(2) concerning "the debtor's or an insider's financial condition;" (3) "on which the creditor . . . reasonably relied; and" (4) "that the debtor caused to be made or published with intent to deceive . . . ." 11 U.S.C. § 523(a)(2). The bankruptcy court's factual determinations regarding these four conditions are not to be set aside unless clearly erroneous. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1165 (6th Cir. 1985).

Oster raises a number of arguments, though from his briefing it is apparent that he does not contest that the writings submitted were materially false and concerned his financial condition. Rather, he argues that the bankruptcy court's determinations on the third and fourth prongs, reliance and intent to deceive, respectively, were clearly erroneous. We address each in turn.

*1. Clarkston's Reliance*

The majority of the bankruptcy court's opinion focused on whether Clarkston's reliance on Oster's false statements was reasonable. After considering the totality of the circumstances, including the nature of the loan approval documents and the value of the marketable securities line

item on the financial statements, the bankruptcy court concluded that Clarkston "did rely on the false statements of the debtor and reasonably so." The district court agreed.

Section 523(a)(2)(B)(iii)'s requirement has been interpreted to require the creditor to prove that it actually relied on the false statement (reliance in fact), and that such reliance was reasonable. *Field v. Mans*, 516 U.S. 59, 68 (1995). This is a higher standard than that of "justifiable reliance," the standard for § 523(a)(2)(A) claims. This Court, in a § 523(a)(2)(A) case that was decided prior to *Field*, articulated five factors that may affect the reasonableness of a creditor's reliance:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*BancBoston Mortg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992). Oster limits his argument on appeal to claims that the bankruptcy court clearly erred when it determined that Clarkston actually relied on the false statements and representations, and when it determined that there were not sufficient "red flags" to put Clarkston on notice that something was amiss.

Oster argues that Clarkston did not rely on the false financial statements because, under Michigan law, certificates of stock and certain other evidences of indebtedness are held by a married couple in a joint tenancy in the entireties. So, he claims, Clarkston should have been on notice that when Oster listed joint assets of eight million dollars in marketable securities, such assets could never have been seized pursuant to a judgment entered against only one spouse. Even if Clarkston employees did not actually know the mechanics of Michigan's entireties law, Oster argues that they

were constructively on notice and thus could not have reasonably relied on the statements. Oster asserts this argument for three different reasons: to prove that Clarkston did not in fact rely on the statements, to show that the statements were not material, and to argue that it was a "red flag" that should have put Clarkston on notice.

This argument fails. While true that Mich. Comp. Laws § 557.151 states that "bonds [and] certificates of stock . . . shall be held by such husband and wife in joint tenancy," that same law also states that this presumption may be overcome if "therein expressly provided . . . ." When Oster presented a financial statement showing that he had over $8,000,000 in marketable securities, and then also signed a loan agreement stating that he would maintain at least $4,000,000 in marketable securities, it was entirely reasonable for Clarkston to believe that those assets were not held as entireties property.[1] While Michigan affords such property a presumption of being included as part of a tenancy in the entireties, the presumption is not absolute, and Oster's own acts suggested otherwise.

Further, Michigan did not make it explicitly clear that brokerage accounts, which were at issue here, were within § 557.151's ambit until 2007—three years after the initial loan agreement's execution. *See Zavradinos v. JTRB, Inc.*, No. 268570, 2007 WL 2404612 (Mich. Ct. App. Aug. 23, 2007). In response, Oster argues that the brokerage accounts at issue contained stock and bond

---

[1]Oster argues that the loan agreement was a "covenant," rather than a "representation," to hold more than four million dollars in marketable securities. For our purposes, this is irrelevant. Rather, the loan agreement's language is probative as to whether Clarkston's reliance on the financial statements, coupled together with the covenant/representation, was reasonable. A loan officer reviewing the financial statements, and then the loan agreement, would reasonably conclude that Oster had access to marketable securities in the requisite amount.

holdings, and that § 557.151 was therefore clearly applicable even before the Michigan Court of Appeals decided *Zavradinos*. Be that as it may, adopting Oster's contention would run afoul of our earlier pronouncement that the reasonable reliance provision of § 523(a)(2)(B) is not a "rigorous requirement" but one that is "directed at creditors acting in bad faith." *Martin*, 761 F.2d at 1166. There is no semblance of bad faith here on Clarkston's part, nor does Oster allege as much.

The only other argument that Oster puts forth as to why Clarkston's reliance was unreasonable is that there were inconsistencies between the marketable securities information on the financial statements and the Merrill Lynch statement printouts. This, Oster argues, was a "red flag" that triggered Clarkston's duty to investigate. The bankruptcy court determined that the account names could have been construed as "some kind of a shorthand designation for the account[s] rather than a statement of precise legal ownership . . . . [t]hey are quite casual or even colloquial in their presentation." The district court noted that Oster's counsel "conceded at oral argument on February 1, 2011, that the full account statements were not introduced into evidence at the bankruptcy proceeding. Therefore, the bankruptcy court's failure to take the full account statements into consideration cannot be clearly erroneous."

In response, Oster argues, without more, that the printouts "clearly did not support" the conclusion that the securities were jointly owned. While this is true, the printouts also fail to clearly support the idea that the accounts were not jointly owned, which is the relevant question when conducting clear-error review. Oster further argues that because the printouts did not provide support for Clarkston's interpretation of the financial statements, Clarkston was under an obligation to further investigate Oster's financial position.

Such an argument relies entirely upon hindsight analysis, and ignores the clear language of § 523(a)(2)(B), which asks whether the creditor reasonably *relied* on the statements. If Clarkston was already suspicious of whether Oster had access to the marketable securities and then received the account printouts, its failure to investigate would be more troubling. But, at the time that it made the decision to lend funds, Clarkston had no reason to believe that Oster lacked access to the marketable securities. The bankruptcy court did not err, clearly or otherwise, in determining that Clarkston actually and reasonably relied upon the false statements and loan agreements.

*2. Oster's Intent*

The bankruptcy court, after determining that Oster knew the misrepresentations in the loan agreements and the figures in the financial statements to be false, inferred "from that knowledge [Oster's] intent to deceive the bank." The district court agreed, noting that "the evidence indicates that [Oster] knew he was submitting documents to Clarkston that misrepresented his individual net worth." Oster contends that Clarkston's failure to provide evidence of his deceptive intent precluded the bankruptcy court from finding that Oster's actions met the intent requirement articulated in § 523(a)(2)(B)(iv). He further argues, without support from any case law, that because he neither saw nor provided the financial statements to Clarkston, and because he did not read the contents of the loan agreements, he did not know the statements to be untrue.

We do not require proof of the debtor's subjective intent to satisfy our inquiry under this prong. In this Court, § 523(a)(2)(B)(iv) is met if "the debtor either intended to deceive the Bank *or* acted with gross recklessness . . . ." *Martin*, 761 F.2d at 1167 (emphasis added); *see also First Nat. Bank of Centerville, TN v. Sansom*, 142 F.3d 433, at *2 (6th Cir. 1998) (unpublished) ("In applying

the holding of *Martin*, this court has also held that gross recklessness is sufficient to establish an intent to deceive and to satisfy § 523(a)(2)(B)(iv).") (internal quotation marks and citation omitted). "It is not uncommon that intent to deceive must be established by circumstantial evidence and by way of inference." *Thorp Credit, Inc. v. Carmen (In re Carmen)*, 723 F.2d 16, 19 (6th Cir. 1983) (Wellford, J., dissenting).

At a minimum, Oster's actions—signing a loan agreement directly adjacent to the marketable securities requirement, seeking a loan under his own name when he knew that only his spouse had an interest in the securities, and permitting his accountant to provide financial statements to Clarkston that Oster did not review–amount to gross recklessness. *See, e.g.*, *Bank One, Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 74 (6th Cir. 1992) (affirming the bankruptcy court's finding of gross recklessness when the debtor failed to include a guaranty obligation of $388,000 in his financial statements for a $225,000 loan). If we were to adopt Oster's position, borrowers would be encouraged to submit statements and to sign loan agreements without having reviewed them, knowing that they could always claim a defense of ignorance if they sought to have their debt discharged.

But even had Oster not acted with gross recklessness, other evidence in the record supports the conclusion that Oster purposefully deceived Clarkston. The bankruptcy court had before it the affidavit of Donald Bolton, a Clarkston employee, in which he stated that

> Claude Oster represented to me verbally that he personally had liquid assets in excess of $4 million to support his request for loans from the Bank totaling $1.35 million. He gave me financial statements, prepared by his accountant, which reflected over $8 million in marketable securities held jointly with his wife. *I reviewed these statements with him . . . .*

(emphasis added). Oster asserts that it was improper for the bankruptcy court to rely on the affidavit because Bolton did not begin working at Clarkston until 2006, two years after the first loan originated. But, it appears that the discussions referred to in Bolton's depositions were about the 2007 renewal, not the original 2004 loan request. Neither the bankruptcy nor district court considered this direct evidence, but we may affirm on any grounds supported by the record. *See Lawrence v. Chancery Ct. of TN*, 188 F.3d 687, 691 (6th Cir. 1999). Because § 523(a)(2) applies to both the original loan request and any "extension, renewal, or refinancing," this misrepresentation to Bolton would be strongly probative of Oster's subjective intent to deceive.

Taken as a whole, the record supports the bankruptcy court's factual findings that Clarkston satisfied § 523(a)(2)(B)(iv). It was not clear error for the bankruptcy court to conclude that Oster, an experienced businessman who had transferred assets out of his control to keep them from creditors, was either grossly reckless or had the requisite intent to deceive when he submitted the false financial statements or signed the loan agreements.

### B. Oster's Evidentiary Claim

Oster argues that Bolton's affidavit was clearly unreliable evidence, and the bankruptcy court erred in relying upon it for proof of Clarkston's reliance. Because Bolton was not employed by Clarkston when the original loans were made, Oster insists that his affidavit should have been given limited import. We review a bankruptcy court's evidentiary determinations for an abuse of discretion. *U.S. Bank Nat. Ass'n v. U.S. E.P.A.*, 563 F.3d 199, 210 (6th Cir. 2009).

As already mentioned, when Bolton's affidavit is read in conjunction with his deposition testimony, it becomes clear that Bolton was speaking of the renewal process, not the loan origination process. Even if this were not the case, any error made by the bankruptcy court would be harmless. Our decision relies upon Bolton's affidavit for only the alternative finding that Oster acted with intent to deceive. If we were to ignore the affidavit, we would still find no clear error in the determination that Oster acted with at least gross recklessness.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED, and the debt owed by Oster to Clarkston is nondischargeable under 11 U.S.C. § 523(a)(2)(B).