**IN RE: John S. BRENT, Debtor(s).**

**Lawrence Bank n/k/a Great American Bank, Plaintiff(s),**

v.

**John S. Brent, Defendant(s).**

**Case No. 13–56661**
**Adversary Proceeding No. 13–2422**

United States Bankruptcy Court,
S.D. Ohio, Eastern Division.

Signed September 29, 2015

Filed September 30, 2015

790

Geoffrey Peters, Attorney for Plaintiff.

Sarah Williams, Attorney for Defendant.

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF CERTAIN DEBT

C. KATHRYN PRESTON, United States Bankruptcy Judge

This cause came on for trial on February 19, 2015, on Complaint of Lawrence Bank To Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A) & (B) (Doc. # 1) (the "Complaint") filed by the Plaintiff, Lawrence Bank[1], the Answer of Defendant John S. Brent to Complaint of Plaintiff Lawrence Bank (Doc. # 6) (the "Answer") filed by the Defendant, John S. Brent, the Post Trial Briefs (Docs. # 29 and # 30) filed by the Lawrence Bank and John S. Brent respectively. Present at the trial were attorney Geoffrey J. Peters representing Lawrence Bank ("the Bank"), and attorney Sarah A. Williams representing John S. Brent ("Dr.Brent"). The Complaint seeks a judgment of nondischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).

### I. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order 05–02 entered by the United States District Court for the Southern District of Ohio, referring all bankruptcy matters to this Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### II. Findings of Fact

The Court makes the following findings of fact based on the evidence adduced at trial including the stipulations by the parties, the exhibits admitted into evidence and the testimony elicited from the witnesses.

On August 22, 2013, Dr. Brent filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. In due course, the Court entered the Discharge of Debtor (Doc. # 33) whereby Dr. Brent was granted a discharge under 11 U.S.C. § 727 of the Bankruptcy Code.

Sometime during 2007, Dr. Brent was introduced to a real estate investment company My Investing Place ("MIP") by his brother, Tim Brent. Tim Brent had had a successful experience with MIP in the past. MIP solicited investors for its clients, one of which was the Indian Ridge Resort Community (the "Indian Ridge Project") located in Branson, Missouri. The Indian Ridge Project was presented to Dr. Brent by Liz McCleery ("Ms. McCleery"), a representative of MIP. The Indian Ridge Project was a high-end residential development with several luxury amenities, such as a water park and a golf course. MIP tried to locate individual investors that were willing to be "credit partners" for the Indian Ridge Project. An individual willing to be a credit partner would use his or her credit to obtain a construction loan in order to provide financing for the construction of individual residential units, such as condominiums or duplexes which were being built by Western Site Services ("Western"). A credit partner was not required to make any financial contributions other than the use of his credit, and in exchange for that use of credit, the credit partner would be compensated $5,000. Credit partners were not expected to have any out-of-pocket ex-

---

1. Parties stipulated to substitution of Great American Bank for Lawrence Bank as the true party in interest based on the merger of the two banks. Notwithstanding, for clarity purposes the Court will continue to refer to the Plaintiff as Lawrence Bank since the testimony and argument by the parties at the trial referred to Lawrence Bank as the Plaintiff.

penses for a down payment or interim interest payments for the construction loan. Western represented that it would make the monthly interest payments on the loan until maturity. At maturity, the credit partner was supposed to obtain end loan financing if the credit partner wanted to retain the residential unit, or the unit was to be sold to satisfy the loan obligation.

Dr. Brent was interested in the Indian Ridge Project because he wanted to own a vacation home closer to where his brother lived in California so that they could spend more time together. After several communications between Ms. McCleery and Dr. Brent, he decided he would participate in the Indian Ridge Project as a credit partner and agreed to provide his credit for the construction of two duplexes.[2] Ms. McCleery advised Dr. Brent that he would be contacted by one Brent Clarkson ("Mr.Clarkson") who owned a company known as Top Flight Lending.

Mr. Clarkson worked with MIP and was responsible for facilitating a relationship between the "lending partners," which were banks that were interested in funding the construction loans, and the credit partners. Mr. Clarkson contacted Dr. Brent and indicated that Lawrence Bank had agreed to be a lending partner with respect to the construction of the one duplex. Mr. Clarkson helped Dr. Brent assemble his paperwork for obtaining approval of the loan, including Dr. Brent's Charles Schwab statement, individual income tax return for the year 2006, TIAA–CREF statement and U.S. Bank statements. Mr. Clarkson also advised Dr. Brent that Wells Fargo had agreed to provide the end loan financing for the transaction. Mr. Clark-

son never disclosed to Dr. Brent during this process that Lawrence Bank required that a down payment be made by him in order to obtain financing. Dr. Brent was under the impression that Mr. Clarkson would be forwarding the loan documentation to the Bank for its consideration and approval.

Contrary to Dr. Brent's understanding, Mike Platt ("Mr.Platt"), a representative from Wells Fargo Mortgage, referred Dr. Brent's loan application to the Bank.[3] David Clark ("Mr.Clark") was the lending officer at the Bank that handled Dr. Brent's loan application and oversaw its approval. Mr. Clark had prior experience working with Mr. Platt and loan referrals from him. The Bank and Mr. Clark did not communicate with Dr. Brent directly but instead only communicated with Mr. Platt regarding Dr. Brent's loan application. Mr. Clark reviewed and assembled the loan packet for Dr. Brent's loan and submitted it to the Bank's loan committee for approval (the "Loan Presentation"). The Bank required the following items be provided before it would approve a construction loan for the Indian Ridge Project: (1) a loan application; (2) income verification; (3) asset verification; (4) credit report; (5) appraisal; and (6) an end loan commitment. In addition, the Bank required a 20% down payment be made by the applicant for the purchase of the duplex. The Bank communicated these requirements to and requested these documents from the Wells Fargo Mortgage representative, but not Dr. Brent. All the information received by the Bank was received from the Wells Fargo Mortgage representative.

---

**2.** Dr. Brent only financed one of the duplexes with the Bank; the construction of the other duplex was apparently financed with Wachovia Bank.

**3.** There is no evidence in the record of what, if any, relationship Mr. Clarkson had with Mr. Platt. Nor is it known how Dr. Brent's loan application ended up in the hands of Mr. Platt for referral to Mr. Clark.

The Loan Presentation indicated that the construction costs and lot costs related to Dr. Brent's duplex were $490,000, and that a down payment of $98,000 would be provided leaving a total loan amount of $392,000. The Bank expected Dr. Brent to make the $98,000 down payment (the "Down Payment"), but this expectation was only communicated to the Wells Fargo Mortgage representative. In fact, the Bank had no direct contact with Dr. Brent until after default of the loan occurred. The repayment schedule for the construction loan called for interest payments monthly with principal being paid at maturity.[4]

The Bank allegedly believed the Down Payment was being paid by Dr. Brent because of various documents it received. One of which was the loan application signed by Dr. Brent (the "Loan Application") which indicated the source of the down payment was from stocks, bonds and checking and savings accounts. In addition, the Loan Application indicates that no part of the down payment was borrowed. The second document is a certification and authorization form (the "Certification") signed by Dr. Brent that certifies, among other things, that all the information provided by Dr. Brent regarding the amount and source of any down payment is true and complete. The Bank also received a copy of a letter (the "Confirmation Letter") authored by Western indicating it was in receipt of funds in the amount of $98,000 representing a 20% down payment with respect to Dr. Brent's loan transaction. And finally, the Bank believed that the Down Payment had been made by Dr. Brent because the settlement statement (the "HUD Statement") signed by Dr. Brent at the closing of the loan contains a line item for deposit or earnest money in the amount of $98,000.

The Bank ultimately approved Dr. Brent for the construction loan. The Bank chose to use Great Lakes Title & Escrow Corporation ("Great Lakes") as the title company for closing the loan with Dr. Brent. The Bank reviewed the HUD Statement prior to the closing. The Bank's standard procedure for verifying whether a down payment was received is to require a copy of the check and a letter from the seller that the down payment was received. Contrary to the Bank's standard procedures, for Dr. Brent's transaction, the Bank only required a copy of the Confirmation Letter when it reviewed the HUD Statement related to Dr. Brent's loan in order to verify whether the Down Payment had been received. The Bank varied from its normal procedures based on a recommendation from Great Lakes.

Great Lakes then forwarded the loan closing documents to a notary and agent in the Columbus, Ohio area to meet with Dr. Brent. On January 10, 2008, Dr. Brent met the notary at a public library in Worthington, Ohio to execute the documents. The loan documents had been faxed to the notary earlier that day, and he brought them to the library for Dr. Brent to sign. The stack of loan documents that the notary public presented to Dr. Brent for execution were each flagged with a red arrow sticker to alert Dr. Brent where he needed to place his signature. Dr. Brent did not read the documents prior to signing them. They were hardly legible anyway.

For a period of time after Dr. Brent closed on his construction loan, Western made the interim interest payments pursuant to the repayment terms of the loan. However, during the late summer (August or September) of 2008, the development of the Indian Ridge Project stopped, and Western ceased making the interim inter-

---

4. The original maturity date for the construction loan was May 19, 2008; however, that date was extended by the Bank sometime in June 2008 to the end of December 2008.

est payments for the loan. Although Dr. Brent did not expect to have any financial requirements as a "credit partner", he recognized that he was ultimately liable for the debt, and made three interim interest payments. Thereafter, Dr. Brent defaulted on the construction loan, and the Bank sued Dr. Brent in state court in the Circuit Court of Stone County, Missouri (the "State Court Action"). The State Court Action resulted in a judgment against Dr. Brent in the amount of $487,742.88 (the "Judgment"). The Bank now seeks a determination that the Judgment is nondischargeable on the basis that Dr. Brent (1) made material misrepresentations about making the Down Payment in order to receive financing for the construction loan, and the Bank relied upon same, and (2) never intended to pay the loan.

## III. Discussion

■ "The principal purpose of the Bankruptcy Code is to afford a 'fresh start' to the 'honest but unfortunate debtor.'" *Oster v. Clarkston State Bank (In re Oster)*, 474 Fed.Appx. 422, 424 (6th Cir.2012) (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). However, "[t]he provisions for discharge of a bankrupt's debts, 11 U.S.C. §§ 727, 1141, 1228, and 1328(b), are subject to exception under 11 U.S.C. § 523(a), which carries ... subsections setting out categories of nondischargeable debts." *Field v. Mans*, 516 U.S. 59, 64, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

"Section 523(a)(2) contains two independent grounds for nondischargeability, both sounding in fraudulent conduct." *First Knox Natl. Bank Div. of PNB v. Welling (In re Welling)*, 2013 WL 3760112, *2, 2013 Bankr.LEXIS 2890, *5 (Bankr.N D.Ohio 2013). 11 U.S.C. § 523(a)(2)(A) provides in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

The elements for a § 523(a)(2)(B) action are found within the statute, which states that the discharge does not cover a debt to the extent it was obtained by

(B) use of a statement in writing —

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

*Welling*, 2013 WL 3760112 at *3, 2013 Bankr.LEXIS 2890 at *6 (quoting 11 U.S.C. § 523(a)(2)(B)).

Subsections (A) and (B) are mutually exclusive. All statements regarding a debtor's financial condition, whether written or oral, are expressly excluded from subsection (A). Rather, such a creditor must proceed under subsection (B) and satisfy the requirement that the statement of financial condition be in writing. A debt based upon an oral misrepresentation of financial condition is not actionable and will be dischargeable. Conversely, a debt obtained through fraudulent written statements about a debtor's financial condition will be nondischargeable. As a result of this construction, whether a debt under this section is dischargeable or nondischargeable depends on whether the fraudulent misrepresentation (i) is oral or in writing and (ii) whether the state-

ment concerns the debtor's financial condition.

*Prim Capital Corp v. May (In re May)*, 2007 WL 2052185, *5, 2007 Bankr.LEXIS 2335, *14–15 (6th Cir. BAP 2007) (citations omitted).

 The Plaintiff bears the burden of proof when pursuing an exception to discharge against the Debtor. *Abroms v. Kern (In re Kern)*, 289 B.R. 633, 637 (Bankr.S.D.Ohio 2003). The standard of proof for establishing an exception to discharge pursuant to 11 U.S.C. § 523(a) is "the ordinary preponderance-of-the evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 The burden of establishing a fact by a preponderance of the evidence requires the [judge] to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence. Thus, a preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it. In a case where the evidence is evenly balanced, the [party with the burden of persuasion] must lose.

 *Inderwish v. Luong (In re Luong)*, 2013 WL 1385674, *3, 2013 Bankr.LEXIS 1363, *7–8 (Bankr.D.Colo.2013) (internal quotation marks, footnotes and citations omitted). Further, exceptions to discharge are to be strictly construed against the party seeking the same. *Rembert v. AT & T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998) (citation omitted).

In the present case, all of the statements that the Bank asserts are misrepresentations made by Dr. Brent are written statements, so either subsection of 11 U.S.C. § 523(a)(2) could apply. Accordingly, the Court must determine whether the written

statements are statements respecting Dr. Brent's financial condition.

## A. Statements respecting the debtor's financial condition

The phrase "respecting the debtor's ... financial condition" is not defined in the Code and is thus subject to interpretation. The Court of Appeals for the Sixth Circuit has not directly addressed this issue. The Sixth Circuit has, however, implied that statements showing a debtor's net worth are statements respecting an individual's financial condition. *See Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 89–90 (6th Cir.1993) (explaining that a debtor made " 'statements in writing respecting the debtor's or an insider's financial condition' ... because [the debtor] submitted written statements at the closing which plainly showed his net worth").

*May*, 2007 WL 2052185 at *6, 2007 Bankr.LEXIS 2335 at *15–16.

The "broad interpretation" includes any communication that has a bearing on the debtor's financial position. In other words, any communication addressing the status of a single asset or liability qualifies. The "strict interpretation," on the other hand, limits statements "respecting the debtor's ... financial condition" to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities.

 *May*, 2007 WL 2052185 at *6, 2007 Bankr.LEXIS 2335 at *16–17 (citations ómitted). "The strict interpretation, limiting statements concerning the debtor's financial condition only to those that actually claim to state the debtor's overall financial health, net worth or assets and liabilities, is most consistent with the text and structure of the Bankruptcy Code." *May*, 2007 WL 2052185 at *6, 2007

Bankr.LEXIS 2335 at *17 (citation omitted). In contrast, "[a] broad interpretation simply brings too many statements under the rubric 'concerning the debtor's financial condition,' rendering the limitation meaningless." *May*, 2007 WL 2052185 at *6, 2007 Bankr.LEXIS 2335 at *18 (citation omitted). Moreover, bankruptcy courts are frequently reminded that exceptions to discharge are to be narrowly construed in favor of a debtor, and a strict interpretation of the statute is more consistent with that approach.

### 1. Exhibit 2 is Admissible

■ Prior to addressing whether the Loan Application should be analyzed under § 523(a)(2)(A) or (B), the Court must first address the admissibility of the Loan Application into evidence. During the trial, the Bank requested admission of the Loan Application into evidence as Plaintiff's Exhibit No. 2 ("Exhibit 2"). Counsel for Dr. Brent objected to its admission on the basis that the copy of the Loan Application presented in the trial exhibit binder was illegible. The Loan Application is a Uniform Residential Loan Application form created by Fannie Mae and Freddie Mac, and the version date of the form appears to be November 10, 2007, though that date is not entirely legible. The Court agreed that the Loan Application presented for admission was mostly illegible, but that it could read some portions of it.[5] Because the Bank anticipated the possibility of the Loan Application's illegibility being an issue, it also provided a blank copy of a Uniform Residential Loan Application form created by Fannie Mae and Freddie Mac (the "Blank Form") that is legible to be included as part of Exhibit 2 in an attempt to help parties read the language

in the Loan Application more easily. The version date of the Blank Form, however, differs from the Loan Application. Counsel for Dr. Brent objected to the admission of the Blank Form into evidence because it was a different version than the form used for the Loan Application. The Court conditionally admitted Exhibit 2 and allowed the parties an opportunity to brief the issue regarding its admissibility.

Upon consideration of the record, the Court finds that the partial illegibility of the Loan Application goes to the weight of the exhibit and not the admissibility. *See United States v. Brooks*, 1990 WL 152545, *6 n. 2, 1990 U.S.App. LEXIS 17872, *8 n. 2 (6th Cir.1990) (deciding whether a partially inaudible tape should be admitted, the Sixth Circuit Court of Appeals noted that "[a] writing would not be rendered inadmissible just because some of the words were illegible ...". Accordingly, the objection to the admission of the Loan Application is overruled

According to Mr. Clark, the Blank Form is largely the same as the Loan Application, and the language is identical in the sections of the Loan Application that the Court must reference in order to decide this case. The rules of evidence allow admission of relevant evidence, and this Court notes that "[a] principal reason for admitting all relevant evidence is that the probability of ascertaining the truth increases as the trier's knowledge grows." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 402.02 (3d ed.2015) (citations omitted); *see generally* Fed.R.Evid. 401, 402. Accordingly, the Court also overrules the objection to the admission of the Blank Form. The

---

**5.** Mr. Clark offered to provide the Court the Bank's original copy of the Loan Application with Dr. Brent's signature in blue ink for consideration as it was a little more legible than the copy proposed for admission into the Court's record. The Court accepted Mr. Clark's offer and is currently in possession of same.

Loan Application and the Blank Form are admitted as Exhibit 2.

### 2. Applicability of § 523(a)(2)(A) and § 523(a)(2)(B)

In this case, the Bank referenced the following four separate documents as evidencing Dr. Brent's misrepresentations about the Down Payment: (1) the Loan Application; (2) the Certification; (3) the HUD Statement; and (4) the Confirmation Letter.

■ The Loan Application is a statement respecting Dr. Brent's financial condition because within that document he listed information regarding his employment, monthly income and expenses, assets and liabilities. The information in the Loan Application represents Dr. Brent's overall financial health, net worth or assets and liabilities so it constitutes a statement respecting the debtor's financial condition and must be evaluated under 11 U.S.C. § 523(a)(2)(B).

■ None of the other documents are statements respecting Dr. Brent's financial condition, so the Bank must proceed under 11 U.S.C. § 523(a)(2)(A) in order to seek a determination of nondischargeability with respect to the Certification, the HUD Statement and the Confirmation Letter. The Certification does not contain any specific information regarding Dr. Brent, but instead is simply a boilerplate form that essentially certifies that Dr. Brent provided correct information to the Bank and that the Bank may verify same. As such, the Certification is not a statement respecting the debtor's financial condition. Similarly, the HUD Statement is not a statement respecting the debtor's financial condition because the information contained therein is specific to one transaction (i.e., the construction loan closing) and does not list any information regarding Dr. Brent's assets, liabilities, income or other information to indicate his overall financial health or net worth. And last, the Confirmation Letter states that Western is in receipt of a down payment in the amount of $98,000; the Confirmation Letter is not a statement respecting the debtor's financial condition because it contains no information regarding Dr. Brent's assets, liabilities, income or other information to indicate his overall financial health or net worth.

### B. 11 U.S.C. § 523(a)(2)(A)

■ "Under § 523(a)(2)(A), there is an exception to discharge of a debt 'for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud....'" *Jennings v. Bodrick (In re Bodrick),* 509 B.R. 843, 854 (Bankr. S.D.Ohio 2014) (quoting 11 U.S.C. § 523(a)(2)(A)). The party seeking a determination that a debt is nondischargeable must prove that:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT & T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 280–281 (6th Cir.1998).

A false representation has been defined as an expressed misrepresentation. In contrast, false pretenses involve an implied representation or conduct that is intended to create and foster a false impression. Actual fraud is a broader concept that has been defined as any deceit, artifice, trick or design involving a direct and active operation of mind, used to circumvent and cheat another— something said, done or omitted with the

design of perpetrating a cheat or deception.

*Bodrick,* 509 B.R. at 855 (internal quotation marks and citations omitted).

### 1. Material Misrepresentation

 "Generally, a material misrepresentation can be defined as substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision.... On the other hand, [a] misrepresentation is not material if the creditor knows it is false or possesses information sufficient to call the representation into question...." *Haney v. Copeland (In re Copeland),* 291 B.R. 740, 761 (Bankr. E.D.Tenn.2003) (internal quotation marks and citations omitted).

### a. The Certification

 The Bank specifically relies upon the first paragraph in the Certification which provides as follows:

1. I (and co-applicant if applicable), John Brent, have applied for a loan from Lender. In applying for the loan, I completed a loan application containing various information about me and the requested loan, such as the amount and source of any downpayment, income information, and assets and liabilities. I certify that all of the information is true and complete. I made no misrepresentations in the loan application or in any related documents, nor did I omit any important information.

Certification, Pl.'s Ex. 26. The Bank asserts that this language in the Certification led it to believe that Dr. Brent would be making a down payment for the construction loan, and that by signing the Certification, Dr. Brent agreed to advise the Bank of the amount and source of any down payment. In addition, the Bank argues that a certification by Dr. Brent that he made no misrepresentations in the Loan Application nor omitted any important information is a misrepresentation by him

because the Loan Application indicates the sources for a down payment were "stocks and bonds, checking savings" when in fact, he did not make any Down Payment. Further, the Bank believes the failure of Dr. Brent to disclose the credit partner arrangement and his receiving $5,000 compensation for participating as a credit partner was important information that was omitted. In contrast, Dr. Brent was under the impression that the Bank knew about the financial arrangement with respect to the credit partner arrangement and was not aware of the requirement that he had to provide the Down Payment.

The Certification when read in conjunction with the Loan Application may contain inaccuracies. The Certification, signed by Dr. Brent, certifies that the information regarding the source of any down payment was true and complete, and that there are no misrepresentations in the Loan Application. The Loan Application contains a section in which the applicant is directed to identify the source of down payment, settlement charges, and/or subordinate financing (the "Source Box"). The Source Box on the Loan Application identifies "stocks and bonds, checking savings" as the source. *See* Loan Application, Pl.'s Ex. 2. The text in the Source Box begs the question: If Dr. Brent was not required to make a down payment, why is there any information in the Source Box? If Dr. Brent intended to deceive the Bank about making the Down Payment, the information in the Source Box would be the genesis of some concern. But as discussed more fully elsewhere in this opinion, the Court finds that Dr. Brent did not intend to deceive the Bank. He did not prepare the Loan Application; rather it was provided to him with the loan documents by the notary. He did not give the Source Box information to anyone for preparation

of the Loan Application, or authorize anyone to insert the representation in the Source Box. In light of these circumstances, the Court views the Source Box text as merely harmless non sequitur.

### b. The HUD Statement

The HUD Statement does not constitute a material misrepresentation because nothing on it identifies who was responsible for paying the Down Payment or who, in fact, made it. The HUD Statement states in part as follows:

| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | |
| --- | --- |
| 201. Deposit or earnest money | 98,000.00 |

| 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| --- | --- |
| 506. Deposit retained by seller | 98,000.00 |

HUD Statement, Pl.'s Ex. 10. The HUD Statement was prepared by Great Lakes, and Mr. Clark acknowledged that either he or someone else at the Bank reviewed it prior to the closing. Dr. Brent signed the HUD Statement at the closing on January 10, 2008. The Bank argues that because Dr. Brent signed the HUD Statement, he misrepresented that he made the Down Payment. The HUD Statement, however, does not specifically identify who contributed the "deposit or earnest money." In fact, the title of that informational box identifies the line items as "AMOUNTS PAID BY *OR IN BEHALF* OF BORROWER." HUD Statement, Pl.'s Ex. 10 (emphasis added). Thus, there is no affirmative statement indicating Dr. Brent contributed the funds, and no misrepresentation by him.

### c. The Confirmation Letter

The Confirmation Letter does not constitute a material misrepresentation made by Dr. Brent because any statement made in the Confirmation Letter cannot be attributed to him. Prior to the closing, the Bank received a copy of the Confirmation Letter which is dated December 19, 2007. The Confirmation Letter is authored by the Managing Member of Western and was addressed to the owner of Great Lakes. The Confirmation Letter indicates Western was in receipt of funds in the amount of $98,000 representing a 20% down payment with respect to Dr. Brent's transaction. The Confirmation Letter does not identify who made the down payment to Western. Nothing in the Confirmation Letter indicates that Dr. Brent was also sent a copy of the letter when it was sent to Great Lakes, or that he was otherwise aware of its existence. There is no evidence that Dr. Brent requested the Confirmation Letter be sent to the Bank. Dr. Brent's signature does not appear on the Confirmation Letter. Accordingly, the Confirmation Letter does not constitute a misrepresentation by Dr. Brent.

None of the statements contained in the HUD Statement, or the Confirmation Letter constitute a material misrepresentation by Dr. Brent. Statements in the Certification may constitute a misrepresentation, but not as to whether Dr. Brent was making the Down Payment. Nor can the Bank satisfy its burden of proving other elements necessary to have the Judgment deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A).

### 2. Intent to Deceive

 The Bank did not prove by a preponderance of the evidence that Dr. Brent possessed an intent to defraud the Bank because the record shows that Dr.

Brent was never aware of the Down Payment requirement, nor did he expect to have any out-of-pocket expenses for participating as a credit partner in the Indian Ridge Project. "Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard ... *Rembert v. AT & T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998) (citing *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995)). "The debtor's intent is ascertained by looking at the totality of the circumstances, and all exceptions to discharge are to be strictly construed against the creditor." *Keeley v. Grider*, 590 Fed.Appx. 557, 560 (6th Cir.2014) (citation omitted). Dr. Brent was never made aware of the Down Payment requirement during the process of applying for and receiving the construction loan from the Bank. To be sure, the marketing brochure from MIP ("MIP Brochure") that Dr. Brent received from Ms. McCleery specifically states in part in the "MIP—Credit Partner Prospectus" as follows:

Fees & Expenses

All expenses and fees for the construction financing are paid for you. There will be no out of pocket cost to close on the construction financing.

MIP Brochure, Def.'s Ex. C. In addition, Dr. Brent received an email from Ms. McCleery (the "McCleery Email") confirming his understanding that no down payment was required to participate as a credit partner in the Indian Ridge Project. The McCleery Email specifically states, in part, that "[w]e [6] are trying to structure this with no money down for you...." McCleery Email dated May 30, 2007 and time-stamped 12:28 P.M., Def.'s Ex. D. Dr.

Brent testified that had he known about the Down Payment requirement, he would not have applied for the construction loan with the Bank. Dr. Brent further stated that he did not even have enough funds available at the time he completed the Loan Application to afford the Down Payment. Moreover, the Bank never communicated to Dr. Brent, orally or in writing, that the Down Payment was a condition precedent to receiving the construction loan. Mr. Clark only communicated that information to Mr. Platt. Mr. Clark admitted that he was not sure whether Mr. Platt was communicating the information regarding the Down Payment to Dr. Brent.

The Bank counters that Dr. Brent acted recklessly by signing the loan documents without reviewing them, and that this mandates a determination that the debt is nondischargeable. Dr. Brent admits that he did not review the documents before signing them. This Court staunchly adheres to the philosophy that failure to read documents does not constitute a defense. *See Oster v. Clarkston State Bank (In re Oster)*, 474 Fed.Appx. 422, 427–28 (6th Cir. 2012) (declining to adopt the debtor's defense that he did not know the statements were untrue because he did not read the contents of the loan agreements). However, as noted above, the documents do not contain misrepresentations that support a finding of nondischargeability. The Court has already discussed the many deficiencies in the various documents and need not repeat that discussion here. Dr. Brent did not prepare the Loan Application provided to him for signature, he did not give the Source Box information to anyone to include in the Loan Application, or authorize anyone to insert the representation in the

6. "The evidence before the Court is that Ms. McCleery was working with MIP to find investors for the Indian Ridge Project, so the Court will conclude that the use of the pronoun "we" in the context of the McCleery Email represents MIP and its representatives and/or agents.

Source Box. There were multiple people involved in putting together the loan transaction; Dr. Brent had been assured repeatedly that there would be no cash demands on him for entering into the transaction. And the documents were largely illegible when presented to Dr. Brent for signature. In light of the circumstances surrounding the transaction, the Court is unable to find that Dr. Brent acted recklessly in connection with execution of the documents such that the debt should be found nondischargeable.

In light of the documentary evidence substantiating Dr. Brent's belief that no down payment or out-of-pocket costs were expected of him, the fact that Dr. Brent did not have liquid assets available to him in sufficient amount to even afford the Down Payment, and the fact that the Bank cannot demonstrate that the Down Payment requirement was communicated to Dr. Brent, the Court finds that Dr. Brent did not intend to deceive the Bank based on the totality of the circumstances.

### 3. Justifiable Reliance

■ The Bank cannot satisfy the justifiable reliance element because the fact that Dr. Brent did not make the Down Payment would have been revealed if only a cursory examination or investigation had been performed by the Bank. Justifiable reliance "is a matter of the qualities and characteristics of the particular [creditor], and the circumstances of the particular case, rather than of the application of a community standard of conduct...." *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

■ Justifiable reliance means that a creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."

*Bodrick*, 509 B.R. at 855 (quoting *Field*, 516 U.S. at 71, 116 S.Ct. 437).

■ Where banks have established a history of dealing, involving trust and confidence, they may be justified in relying on that customer's representations. On the other hand, where there is no history, the bank is sophisticated, the sums are significant, and the lender restricts its inquiry to information provided by the borrower, it is more difficult to establish justifiable reliance.

*Liberty Sav. Bank, FSB v. McClintic (In re McClintic)*, 383 B.R. 689, 694 (Bankr. S.D.Ohio 2008) (citations omitted). In this case, no documents or verbal representations indicated Dr. Brent was the source of the Down Payment; if the source of the Down Payment was important to the Bank, the Bank should have closed that loophole. The Bank did not show that it had an established transactional history with Dr. Brent such that it may be justified in relying solely on their history in order to have confidence that the Bank's requirements were being met. Thus, there is no basis for justifiable reliance illustrated.

The Bank is a sophisticated lending institution with significant experience in approving and funding loans. It has internal procedures established for approval of loans such as requiring certain documentation be provided by an applicant after which a formal presentation is made to a loan committee for final approval. More specifically, the Bank has an internal operating procedure that requires a borrower provide a copy of the down payment check in addition to a letter from a third party that acknowledges receipt of the down payment funds, before the Bank will fund a loan. Contrary to the Bank's normal business procedures, it did not request a copy of the Down Payment check prior to funding the construction loan for

Dr. Brent. The Bank indicated that it varied from its normal operating procedures based on the recommendation from Great Lakes who performed the closing. The Bank, however, could not indicate why Great Lakes made such a recommendation. The Court finds it curious that the Bank would choose to ignore its own internal operating procedures based on a recommendation from an outside and unrelated entity. Clearly, the Bank had procedures in place to ensure that a down payment is actually made and received prior to funding a loan, but in this case, the Bank chose not to follow those procedures. This simple requirement of requesting a copy of the Down Payment check prior to funding would have clearly prevented the loan from closing without the Down Payment having been made. Accordingly, the Bank did not prove justifiable reliance because it failed to utilize its opportunity to make a cursory examination or investigation into whether the Down Payment had actually been paid by Dr. Brent.

The Bank having failed to demonstrate (1) material misrepresentations (2) made with intent to deceive, (3) on which the Bank justifiably relied, the Bank's request for a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A) must fail.

### 4. False Pretenses

■■■■ A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. A false pretense has been defined to include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. A "false representation," on the other hand, is an expressed misrepresentation.

*James v. McCoy (In re McCoy),* 114 B.R. 489, 498 (Bankr.S.D.Ohio 1990) (citations omitted). The Complaint alleges that Dr. Brent engaged in false pretenses in that

he did not intend to pay the loan; however, only a few questions were asked at the trial that arguably related to such a cause of action. Moreover, false pretenses were not discussed during closing argument. Nonetheless, the Court finds that the evidence is insufficient to establish that Dr. Brent obtained the construction loan by false pretenses. Dr. Brent did not expect to have any out-of-pocket expenses related to the construction loan. As a result, Dr. Brent did not personally intend on paying the monthly interest payments; he did, however, intend on those payments being made by someone else as a result of the financing arrangement established by MIP with the lending partners. Accordingly, the Court finds that at the time Dr. Brent incurred the debt for the construction loan, he intended that the Bank be paid, and the fact that he thought a third party would make the interest payments did not amount to being a false pretense.

■■■■ Furthermore, the Court finds that Dr. Brent's failure to disclose the credit partner financing arrangement to the Bank, did not constitute a false pretense or mute charade for purposes of excepting the debt under 11 U.S.C. § 523(a)(2)(A) because the evidence before the Court does not demonstrate that the omission was meant to mislead the Bank into approving and funding the construction loan. Dr. Brent did not disclose the credit partner arrangement to the Bank because he was under the mistaken impression that the Bank was aware of same. The Bank admitted that it did not have any personal contact with Dr. Brent prior to the loan closing, so he would not have had any opportunity to communicate directly with the Bank. Nothing in the Loan Application solicits this information sufficiently clearly to place Dr. Brent under a duty to disclose it. In addition, Dr. Brent was advised by Mr. Clarkson that he would obtain banks that were willing to be lending partners, so

it is reasonable that Dr. Brent was under the impression that the Bank was fully aware of the credit partner financing arrangement. No false pretenses by Dr. Brent have been proven.

### C. 11 U.S.C. § 523(a)(2)(B)

11 U.S.C. § 523(a)(2)(B) provides in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by -

(B) use of a statement in writing -

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive

11 U.S.C. § 523(a)(2)(B). Each of the five elements listed in § 523(a)(2)(B) must be satisfied for the Court to make a finding of nondischargeability of debt.

■ "As long as the written statement is written, signed, adopted or used by the debtor, the basic precondition concerning the writing requirement to the non-dischargeability complaint under section 523(a)(2)(B) is met." *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001) (citations omitted). As previously discussed, the Loan Application is the only document referenced by the Bank that constitutes a statement in writing respecting Dr. Brent's financial condition. Dr. Brent acknowledged his signature on the Loan Application, and despite the fact that he did not personally complete the information in the Loan Application or read the contents before signing it, the Loan Application still satisfies the first element of 11 U.S.C. § 523(a)(2)(B). *See Michael*, 265 B.R. at 598; *see also Dice v. Akron, Canton & Youngstown R.R. Co.*, 155 Ohio St. 185, 191, 98 N.E.2d 301 (1951) ("A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed.... If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs." (citations omitted)).

### 1. Material Falsity

■ "The 'materially false' prong of Code § 523(a)(2)(B)(i) requires more than a merely erroneous or untrue written statement." *Hudson Valley Water Res., Inc. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr.S.D.N.Y.1992). "A statement is materially false if the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001) (citation omitted).

A statement is materially false under section 523(a)(2)(B)(i) if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Borg Warner Cent. Envtl. Sys., Inc. v. Nance (In re Nance)*, 70 Bankr.318, 321 (Bankr.N.D.Tex.1987); *see also In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) ("A recurring guidepost used by courts [for determining material falsity] has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition.") (citing cases); *Boice*, 149 Bankr.at 45 ("The information must not only be substantially inaccurate, but it must also be

information which would have affected the creditor's decision making process.").

■ *Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 625 (2d Cir.1996). In this case, the Bank asserts that two sections of the Loan Application represent materially false statements made by Dr. Brent. The first is the statement contained in section "VIII. DECLARATIONS" (the "Declaration Section"). *See* Loan Application, Pl.'s Ex. 2. The Declaration Section of the Loan Application consists of a number of statements to which the applicant/borrower must respond "yes" or "no" by checking the appropriate box that corresponds to his response. One of the questions asked in the Declaration Section reads as follows: "Is any part of the down payment borrowed?" *See* Loan Application, Pl.'s Ex. 2. Dr. Brent indicated his response to that question was "no." This declaration by Dr. Brent is not inaccurate because Dr. Brent did not believe he had to make a down payment. The Declaration Section of the Loan Application does not provide for any responses by the applicant other than "yes" or "no." Dr. Brent had to choose either "yes" or "no" to the inquiry as there was no option for choosing "not applicable" or something similar. Because Dr. Brent believed there was no requirement to make a down payment, he would be accurate in indicating that he did not borrow funds for something that was not needed.

The second statement the Bank asserts is materially false in the Loan Application is the information listed in the Source Box of the Loan Application. As noted previously, the Source Box identifies "stocks and bonds, checking savings" as the source for the Down Payment. Loan Application, Pl.'s Ex. 2. If a Down Payment was not required, as Dr. Brent asserts, then there would be no need to indicate a source for same. Dr. Brent's indication in the Loan Application that the source of the Down Payment was "stocks and bonds checking savings" could be viewed as a false statement, but in light of this Court's finding that Dr. Brent did not intend to deceive the Bank, the Court views the information in the Source Box as a non sequitur. And even if Dr. Brent's statement in the Source Box is false, the Loan Application is not materially false.

Dr. Brent's Loan Application is not materially false because it does not offer a substantially untruthful picture of his financial condition that affected the Bank's decision to fund the construction loan. First, the Bank did not illustrate that the Loan Application offers a substantially untruthful picture of Dr. Brent's financial condition. The Bank did not allege that Dr. Brent misstated the amount of his income, assets or liabilities in the Loan Application. Furthermore, there is no evidence that the statement in the Source Box somehow impacts the overall net worth of Dr. Brent. To be sure, the Loan Application does not even identify the amount of the Down Payment. Accordingly, the Loan Application does not offer a substantially untruthful picture of the financial condition of Dr. Brent on account of the statement in the Source Box, because reading same does not affect the understanding of the overall net worth of Dr. Brent. Therefore, it does not constitute a materially false statement about Dr. Brent's financial condition.

Second, the Loan Application and statement in the Source Box did not ultimately affect the Bank's decision to fund the construction loan.

"Materiality" ... for purposes of § 523(a)(2)(B) requires more than merely examining the truth of the information provided. A second step is required. The information must not only be substantially inaccurate, but also

must be information which affected the creditor's decisionmaking process.... The information must have actual usefulness to the creditor and must have been an influence on the extension of credit. Although there is substantial similarity between such analysis of "materially" and the element of "reasonable reliance[,]" ... analysis of the creditor's use of the requested information is appropriate in both contexts.

*In re Hunt,* 30 B.R. 425, 440 (M.D.Tenn. 1983) (citation omitted). In this case, the Bank indicates that it never would have approved and funded the construction loan for Dr. Brent had it known that he would not be making the Down Payment. The Bank's conduct in ultimately approving and funding the loan, however, belies this assertion. If indeed the requirement that Dr. Brent make the Down Payment was imperative to the Bank's decision making process as to whether to approve and fund the loan, the fact that the Bank chose not to abide by its own internal operating procedures of receiving a copy of a down payment check prior to approving and funding a loan suggests to the Court that, at least in this case, the existence of the Down Payment did not truly affect the Bank's decision to approve and fund the loan for Dr. Brent.

## 2. Reasonable Reliance

The Bank did not demonstrate that it reasonably relied upon Dr. Brent's statements in the Loan Application. "Exactly what constitutes 'reasonable reliance' in compliance with 11 U.S.C. § 523(a)(2)(B)(iii) in relation to a creditor's reliance upon a written financial statement is not statutorily defined by the Code." *Insouth Bank v. Michael (In re Michael),* 265 B.R. 593, 598 (Bankr.W.D.Tenn.2001) (citation omitted). "Generally, courts have held that 'reasonable reliance' is a question of fact to be determined in light of the totality of the circumstances." *Buckeye*

*Ret. Co., LLC v. Kakde (In re Kakde),* 382 B.R. 411, 422 (Bankr.S.D.Ohio 2008) (citations omitted).

The Sixth Circuit has identified five factors that may affect the reasonableness of a creditor's reliance: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Jennings v. Bodrick (In re Bodrick),* 509 B.R. 843, 857 (Bankr.S.D.Ohio 2014) (quoting *Oster v. Clarkston State Bank (In re Oster),* 474 Fed.Appx. 422, 425 (6th Cir. 2012)). In this case, the Bank did not have a close personal relationship with Dr. Brent. To be sure, the Bank did not have any direct contact or communication with Dr. Brent until after the construction loan went into default status with the Bank. The Bank did not have any previous business dealings with Dr. Brent. The debt was incurred by Dr. Brent for personal reasons (i.e., as a real estate investment and/or vacation home). Finally, and most significantly, had the Bank performed even a minimal investigation regarding the existence of the Down Payment by requiring a copy of the check be submitted to it, in accordance with its own procedures, the inaccuracy would have been revealed. In light of the totality of the circumstances in this case, the Bank has failed to demonstrate that it reasonably relied upon Dr. Brent's statements in the Loan Application

### 3. Published with Intent to Deceive

"[The Court does] not require proof of the debtor's subjective intent to satisfy [its] inquiry under this prong. In this Court, § 523(a)(2)(B)(iv) is met if 'the debtor either intended to deceive the Bank or acted with gross recklessness ...'" *Oster v. Clarkston State Bank (In re Oster)*, 474 Fed.Appx. 422, 427 (6th Cir.2012) (citations omitted).

> In the Sixth Circuit, the standard for determining intent includes actual intent to deceive as well as gross recklessness.... A determination of intent to deceive focuses on circumstantial evidence and is generally "inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor." If there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor.

*Buckeye Ret. Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 427 (Bankr.S.D.Ohio 2008) (citations omitted). For all the same reasons discussed previously regarding intent as it related to the Bank's claims under 11 U.S.C. § 523(a)(2)(A), the totality of the circumstances in this case do not present a picture of deceptive conduct by Dr. Brent. Dr. Brent was not aware that he was required to make the Down Payment which is substantiated by the MIP Brochure and the McCleery Email. The Bank never communicated with Dr. Brent whether orally or in writing about the requirement that he make the Down Payment. In this case, there is ample room for an inference of an honest intent on behalf of Dr. Brent, and thus, the Court must find in favor of him. Accordingly, the Judgment is not excepted from the operation of the discharge under 11 U.S.C. § 523(a)(2)(B).

### IV. Conclusion

For the foregoing reasons, the Plaintiff, Lawrence Bank, has failed to demonstrate that it is entitled to judgment under 11 U.S.C. § 523(a)(2)(A) and (B). A separate final judgment will be entered in accordance with this opinion.

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**